HARLEY M. BROYLES #11640
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
T: (808) 599-2436
Email: hbroyles@earthjustice.org

BRETTNY HARDY
(*pro hac vice* pending)
EARTHJUSTICE
180 Steuart Street #194330
San Francisco, California 94105
T: (415) 217-2000
Email: bhardy@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| CONSERVATION COUNCIL FOR HAWAIʻI and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION and DR. NEIL JACOBS, in his official capacity as Administrator of the National Oceanic and Atmospheric Administration,<br><br>Defendants. | CIVIL NO. CV-26-506<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Conservation Council for Hawaiʻi (CCH) and Center for Biological Diversity (the Center) hereby complain of the actions of Defendants National Oceanic and Atmospheric Administration (NOAA) and NOAA Administrator Dr. Neil Jacobs as follows:

INTRODUCTION

1. This case challenges NOAA's certification of The Metals Company USA's (TMC USA) application for a license under the Deep Seabed Hard Mineral Resources Act (DSHMRA) to conduct seabed mining exploration activities.

2. Congress enacted DSHMRA in 1980 to establish an "interim legal regime" to regulate the exploration and mining of seabed minerals by U.S. citizens in international waters pending a Law of the Sea Treaty. 30 U.S.C. § 1401. The Law of the Sea Treaty entered into force among its parties in 1994, establishing the International Seabed Authority to regulate mineral exploration and exploitation in the seabed beyond the limits of national jurisdiction. The United States has not ratified the treaty as intended, so DSHMRA remains in effect.

3. To date, NOAA has only issued one set of DSHMRA approvals, four exploration licenses in 1984, well before the Law of the Sea Treaty came into effect. The licenses have been effectively dormant for decades due in part to the

lack of international recognition of them and the need for concerted international coordination.

4. In July 2025, TMC USA submitted an amended application (TMC USA Application B) to NOAA for an exploration license in an area it designated as "USA-B" that covers nearly 122,000 $km^2$ in the Clarion-Clipperton Zone (CCZ), an area beyond the limits of national jurisdiction that lies between Hawai‘i and Mexico. TMC USA's proposed exploration activities would harm marine ecosystems by emitting loud noises, introducing blinding lights, and stirring up toxic sediment plumes, among other impacts, all of which harm and disrupt important behaviors of marine mammals, sea turtles, fish, and other species.

5. DSHMRA contains rigorous procedural and substantive requirements to ensure transparency, robust public participation, and environmental protection before any authorizations may be issued. After NOAA receives a complete application, it must make that application *and* all relevant materials available for public review and comment. Based on the information received, NOAA determines whether to "certify" that the applicant meets eligibility requirements to receive a license.

6. On May 26, 2026, NOAA certified TMC USA Application B. While NOAA provided an opportunity for public comment on the application itself, it failed to comply with DSHMRA's requirement to make relevant materials

available. In doing so, NOAA left commenters in the dark about the supporting documents, analyses, and scientific, technical, and financial information on which NOAA would base its certification decision.

7. Plaintiffs therefore ask this Court to declare that NOAA's certification of TMC USA Application B was done without observance of the procedure required by law and is arbitrary and capricious and contrary to DSHMRA, in violation of the Administrative Procedure Act (APA) and DSHMRA, and to vacate the certification.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (actions to compel officers and agencies of the United States to perform their duty), 28 U.S.C. §§ 2201–2202 (power to issue declaratory judgments in cases of actual controversy) 30 U.S.C. § 1416(d) (judicial reviewability of DSHMRA certification decisions), and 5 U.S.C. §§ 701–706 (actions under the APA).

9. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority, and Plaintiff Conservation Council for Hawaiʻi resides in this judicial district.

10. This Court has authority to grant Plaintiffs' requested relief pursuant to the APA, 5 U.S.C. § 706(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

11. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

## PARTIES

12. Plaintiff CONSERVATION COUNCIL FOR HAWAIʻI (CCH) is a non-profit citizens' organization incorporated and based in Hawaiʻi with approximately 4,000 members in Hawaiʻi, the United States mainland, and foreign countries. CCH is the Hawaiʻi affiliate of the National Wildlife Federation, a non-profit membership organization with over 5.8 million members and supporters nationwide.

13. CCH's mission is to protect Hawaiʻi's native wildlife, including threatened and endangered species, and to restore the ecosystems on which those species depend for future generations. The wildlife species that CCH has worked to protect include whales, sea turtles, sharks, rays, and seals that are found in the waters of the CCZ and around Hawaiʻi. CCH's members' interests in these species will be harmed by allowing deep-sea mining-related activities, including

exploration, in and around the proposed license areas in the CCZ, as well as by associated increased vessel traffic in Hawai‘i’s waters.

14. CCH members include marine biologists and cultural practitioners who regularly visit, study, work, and recreate in marine waters within and near the USA-B area and in Hawai‘i that would be affected by deep-sea mineral exploration and exploitation activities. CCH members study, enjoy, and benefit from whales, sea turtles, sharks, rays, seals, and other marine wildlife that inhabit or migrate through the USA-B area and waters around Hawai‘i—including animals that migrate between the two areas—for recreational, professional, scientific, educational, aesthetic, spiritual, and cultural purposes. CCH members’ use and enjoyment of the marine environment around the USA-B area and around Hawai‘i will be harmed by the deep-sea mineral exploration activities planned in TMC USA Application B.

15. For example, one of CCH’s members is a Native Hawaiian professional diver and cultural practitioner who has observed and studied—and will continue to observe and study—whales, sharks, sea turtles, rays, and other species in the ocean surrounding the Hawaiian Islands. This member has a cultural and spiritual connection to these species that occur in Hawai‘i’s waters that will be affected by deep-sea mining exploration activities. This member regularly takes friends and family on nearshore diving tours to *kilo* (Native Hawaiian

observational technique) for green sea turtles, hawksbill turtles, giant Pacific manta rays, Hawaiian monk seals, and oceanic whitetip sharks. This member also regularly ventures on boats to deeper waters around the Hawaiian Islands to *kilo* for species including false killer whales, sperm whales, olive ridley sea turtles, and leatherback sea turtles. This member also has a deep cultural and familial connection to Hawaiʻi's sharks, including the oceanic whitetip shark, which he regards as *ʻaumakua* (embodiment of ancestral guardians), and which his family and ancestors, with lineage as *kahu manō* (shark keepers), have advocated to protect since time immemorial. Deep-sea mineral exploration in the USA-B area, as well as related vessel traffic in Hawaiʻi's waters, threatens to harm the species that this member observes (many of which are highly migratory), thereby injuring his cultural, spiritual, and aesthetic interests.

16. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a non-profit environmental organization founded in 1989 and dedicated to the protection of native, threatened, and endangered species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with field offices throughout the United States and Mexico, including in Honolulu, Hawaiʻi and La Paz, Mexico. The

Center has over 100,000 members, including members in Hawaiʻi and Mexico, dedicated to the protection and restoration of imperiled species and wild places.

17. The Center and its members are concerned with the conservation of marine ecosystems and imperiled species, including those that will be adversely affected by deep-sea mineral exploration in the USA-B area. The Center has been involved in many lawsuits and campaigns against deep-sea mining, and other suits to protect the wildlife that will be harmed by deep-sea mining and exploration activities in the proposed permit, as well as from associated vessel traffic, including ESA-listed sharks, rays, whales, seals, seabirds, sea turtles, and corals.

18. Members of the Center derive aesthetic, professional, cultural, educational, and recreational benefits from viewing listed species that live in or migrate through the USA-B area and other areas affected by the action—including waters around Hawaiʻi and Mexico—and that will be harmed by deep-sea mining and exploration activities.

19. For example, one Center member is an environmental scientist and activist in Mexico who regularly studies and writes about the CCZ and the potential effects of deep-sea mining on its biodiversity and on ecological connectivity between the CCZ and Mexican waters. She has scientific and professional interests in whales, sea turtles, sharks, and other migratory marine species that use the Eastern Pacific, including the proposed license areas, and has

authored scientific articles highlighting the scientific risks of allowing deep-sea mining to proceed before its environmental consequences are fully understood. Aside from her scientific and professional interests, she also has a personal interest in observing migratory marine species that inhabit and travel through the areas near the proposed project. She has a particular interest in the benthic species and ecological communities associated with polymetallic nodule fields, many of which are poorly known to science and are directly dependent on habitats that would be removed or disturbed by mining. Deep-sea mining and exploration activities threaten those interests by degrading habitat and potentially exposing migratory species to sediment plumes, underwater noise, vessel traffic, pollution, and other mining-related disturbances. Harm to these species and ecosystems would impair her professional, scientific, conservation, and aesthetic interests in studying, documenting, and protecting the CCZ.

20. Another member of the Center is a Native Hawaiian who regularly surfs in Hawaiʻi's marine waters and deeply values the opportunity to observe and experience native species like the *koholā*, or whales—including ESA-listed whales—in their natural environment. Her connection to *koholā* is both personal and cultural. As a Native Hawaiian, she understands *koholā* as an important part of the living ocean and of her cultural relationship with the *kai* (ocean). She takes particular joy in seeing migratory *koholā* return to Hawaiʻi each year and seeks

opportunities to observe them while spending time in and around the ocean. She also values observing other protected marine wildlife in Hawai‘i, including *‘īlioholoikauaua* (Hawaiian monk seals), *honu* (green sea turtles), and *honu ‘ea* (hawksbill sea turtles). Seabed mineral exploration activities in the USA-B area (including associated vessel traffic through Hawai‘i waters) threaten to harm the ESA-listed species that this member observes, thereby injuring her cultural, spiritual, recreational, and aesthetic interests.

21. NOAA’s failure to comply with DSHMRA and APA has caused and is causing Plaintiffs’ members procedural harms connected to their substantive professional, scientific, educational, aesthetic, spiritual, and cultural interests in marine wildlife in waters of the USA-B area and Hawai‘i. Plaintiffs’ members rely on NOAA to comply with the requirements of the DSHMRA to prevent undue harm to marine wildlife and ecosystems from seabed mineral exploration and mining. NOAA’s issuance of an exploration license to TMC USA depends on NOAA’s certification of TMC USA Application B. NOAA’s failure to comply with DSHMRA has also deprived Plaintiffs and their members of access to information that must be disclosed pursuant to that statute.

22. The interests of Plaintiffs and their members have been, are being, and will be adversely affected by NOAA’s violation of federal law, as described herein. These harms can only be remedied if the Court orders NOAA to comply

with DSHMRA and the APA and conduct a legally adequate DSHMRA process for TMC USA Application B. Plaintiffs have no other adequate remedy at law.

23. Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION (NOAA) is the federal agency with responsibility for administering and implementing DSHMRA. *See* 30 U.S.C. §§ 1403(12), 1412. Among other responsibilities, NOAA is responsible for certifying and issuing exploration licenses. *See id.* § 1413.

24. Defendant DR. NEIL JACOBS is sued in his official capacity as the Administrator of NOAA. In that capacity, Dr. Jacobs is responsible for administering and implementing DSHMRA.

## LEGAL FRAMEWORK

### I. DEEP SEABED HARD MINERAL RESOURCES ACT

25. Congress enacted DSHMRA in 1980 to create what it envisioned would be "an interim program to regulate the exploration for and commercial recovery of hard mineral resources of the deep seabed by United States citizens." 30 U.S.C. § 1401(b)(3). The "deep seabed" refers to the seabed beyond the jurisdiction of any nation. *Id.* § 1403(4).

26. In enacting DSHMRA, Congress recognized the international "principle that the mineral resources of the deep seabed are the common heritage of mankind, with the expectation that this principle would be legally defined under

the terms of a comprehensive international Law of the Sea Treaty yet to be agreed upon." *Id.* § 1401(a)(7). Congress declared "it is in the national interest of the United States" to have "a widely acceptable Law of the Sea Treaty, which will provide a new legal order for the oceans covering a broad range of ocean interests, including exploration for and commercial recovery of hard mineral resources of the deep seabed." *Id.* § 1401(8). DSHMRA established "an interim legal regime … until such time as a Law of the Sea Treaty enters into force with respect to the United States." *Id.* § 1401(16).

27. The United Nations Convention on the Law of the Sea (UNCLOS) entered into force in 1994, but not with respect to the United States. The United States has not ratified UNCLOS, so DSHMRA remains in effect.

28. DSHMRA creates a framework in which NOAA can issue licenses and permits to U.S. citizens authorizing them to engage in deep seabed exploration or commercial production activities, respectively, on the deep seabed. *Id.* § 1412.

29. A license or permit gives the holder the right to explore or mine a given tract, which is exclusive against other citizens of the United States or a "reciprocating state." *Id.* § 1412(b)(2). A license or permit does not prevent other non-U.S. entities from mining or exploring the same tract. Rather, if a national or government of another country interferes with the DSHMRA-permitted activity,

"the Secretary of State shall use all peaceful means to resolve the controversy." *Id.* § 1412(b)(4).

30. An exploration license authorizes the holder "to engage in exploration within a specific portion of the sea floor." 15 C.F.R. § 970.102. Exploration includes at-sea observation and evaluation activities to document mineral resources and environmental conditions in the license area "which must be taken into account to achieve commercial recovery," as well as extraction of minerals as "necessary for the design, fabrication, and testing of [mining] equipment." 30 U.S.C. § 1403(5).

31. A valid exploration license entitles the holder, "if otherwise eligible under" DSHMRA, "to a permit for commercial recovery." *Id.* § 1412(b)(3). "Such a permit recognizes the right of the holder to recover hard mineral resources, and to own, transport, use, and sell hard mineral resources recovered … ." *Id.*; *see also id.* § 1403(1) (defining "commercial recovery").[1]

32. Before applying for a license or permit, a prospective applicant may request pre-application consultation with NOAA to assist the applicant in preparing its application to meet regulatory requirements. 15 C.F.R. § 970.200(d).

[1] While not provided for by statute, NOAA has enacted regulations that allow an applicant to simultaneously apply for an exploration license and commercial recovery permit for the same area. 91 Fed. Reg. 2642 (Jan. 21, 2026) (codified at 15 C.F.R. § 971.214).

33. When applying for an exploration license, the applicant must provide sufficient information to demonstrate that it satisfies four requirements to be eligible for certification: 1) that "the applicant will be financially responsible to meet all obligations which may be required" for the proposed exploration; 2) that "upon issuance or transfer of the license … , the applicant will have the technological capability to engage in such exploration"; 3) that the applicant has fulfilled its obligations under any other DSHMRA license or permit; and 4) that the applicant's proposed recovery plan "meets the requirements of" DSHMRA and its implementing regulations. 30 U.S.C. § 1413(c); *see also* 15 C.F.R. §§ 970.200–.208.

34. The exploration plan must "set forth the activities proposed to be carried out during the period of the license, describe the area to be explored, and include the intended exploration schedule and methods to be used, the development and testing of systems for commercial recovery to take place under the terms of the license, an estimated schedule of expenditures, measures to protect the environment and to monitor the effectiveness of environmental safeguards and monitoring systems for commercial recovery, and such other information as is necessary and appropriate" under DSHMRA. 30 U.S.C. § 1413(a)(2)(A), (B); *see also* 15 C.F.R. § 970.203.

35. An applicant also must provide NOAA with "physical, chemical and biological information for the exploration area," as well as other information that will allow NOAA to evaluate "the environmental impacts of the activities proposed by the applicant." 15 C.F.R. § 970.204(a).

36. After NOAA receives an application, it first determines if the application is "in substantial compliance" with the information requirements. *Id.* § 970.209. Concurrent with that review, NOAA distributes the application to other federal agencies whose activities may be affected by the proposed activities, such as the Departments of State, Transportation, Justice, Interior, Defense, Treasury, and Labor, and the Environmental Protection Agency. *Id.* § 970.211.

37. If an application is in substantial compliance, NOAA must publish a Federal Register notice of the application. 30 U.S.C. § 1426(a)(1). "Interested persons shall be permitted to examine the materials relevant to any of these actions [i.e., an application], and shall have at least 60 days after publication of such notice to submit written comments to the Administrator." *Id.*; *see also* 15 C.F.R. § 970.212(a). NOAA must also hold at least one public hearing at which it invites interested persons to provide their comments on the application. 30 U.S.C. § 1426(a)(2).

38. NOAA next determines whether to "certify" the application. *Id.* § 1413(g); 15 C.F.R. §§ 970.400–.408. NOAA may only certify an application if the

agency finds, in writing and based on all evidence before it, that that applicant meets the four eligibility requirements in 30 U.S.C. § 1413(c). *See also* 15 C.F.R. § 970.400.

39. "Any determination" by NOAA "to certify or deny certification of an application" for an exploration license "is subject to judicial review as provided in chapter 7 of title 5" (i.e., the APA). 30 U.S.C. § 1416(d).

40. Within 180 days after certification, NOAA will propose terms, conditions, and restrictions for a proposed exploration license. 30 U.S.C. § 1415(b)(1). DSHMRA requires each license to include terms, conditions, and restrictions that "assure protection of the environment." *Id.* § 1419(b). At the same time NOAA proposes terms and conditions, it must complete a draft environmental impact statement (EIS) for the license under the National Environmental Policy Act. *Id.* § 1419(d). NOAA must publish a Federal Register notice of the proposal to issue the license and must make the proposed license, the draft EIS, and all other "relevant" materials available for public review. *Id.* § 1426(a)(1); 15 C.F.R. § 970.501(a). NOAA must provide the public 60 days to review the materials and submit comments, and must hold at least one public hearing on the draft EIS and proposed license. 30 U.S.C. § 1426(a); 15 C.F.R. § 970.501.

41. NOAA may then issue a license only if it can determine in writing—based on the comments received, consultation with other agencies, the application materials, and a final environmental impact statement—that the proposed activities: "(1) will not unreasonably interfere with the exercise of the freedoms of the high seas by other states, as recognized under general principles of international law; (2) will not conflict with any international obligation of the United States established by any treaty or international convention in force with respect to the United States; (3) will not create a situation which may reasonably be expected to lead to a breach of international peace and security involving armed conflict; (4) cannot reasonably be expected to result in a significant adverse effect on the quality of the environment … ; and (5) will not pose an inordinate threat to the safety of life and property at sea." 30 U.S.C. § 1415(a).

42. If NOAA determines legal requirements have been met and issues the license, it must publish notice of that decision in the Federal Register. 15 C.F.R. § 970.509.

II. ADMINISTRATIVE PROCEDURE ACT

43. The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

44. The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

45. When a notice-and-comment requirement applies, the APA requires an agency to "identify and make available technical studies and data that it has employed" to provide sufficient notice to commenters. *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1089 (9th Cir. 2011) (citation omitted).

## STATEMENT OF FACTS

### I. SEABED MINERAL EXPLORATION AND MINING HARM MARINE WILDLIFE AND ECOSYSTEMS.

46. The ocean environment in the CCZ supports a rich array of biodiversity, from microbial organisms and small invertebrates to commercially important fish to megafauna like sea turtles and whales.

47. The CCZ spans an expansive region of the equatorial Pacific between Hawai'i and Mexico, encompassing abyssal plains and hills dotted with seamounts. *See infra* Figure 1. Water depths range from about 10,000 feet down to almost 20,000 feet.

48. Lying across the muddy bottom are polymetallic nodules—potato-size mineral deposits containing nickel, manganese, copper, cobalt, and other materials. These nodules serve as crucial hard-substrate habitat for deep-sea biota.

49. While the vast majority of species found in the deep sea remain unidentified or undiscovered, the research expeditions that have been conducted

thus far have found that the CCZ seafloor ecosystem contains great biodiversity and ecological importance. Many species may have pharmaceutical or other commercial value; for example, treatments for cancer and arthritis have been derived from deep-sea sponges.

50. Hundreds of seamounts across the CCZ are home to biodiverse communities of corals, sponges, and other species. Seamounts are hotspots for sharks, tunas, and other large predators.

51. The midwaters in the region also host a biodiverse and commercially important community of organisms, like tuna, squid, cephalopods, and a broad array of other fish and invertebrates.

52. Dozens of migratory species are found in the CCZ, including whales, dolphins, sea turtles, sharks, giant manta rays, and seabirds.

53. Due to the mineral content of polymetallic nodules, companies have expressed interest in mining these deposits from the seabed for profit. To date, there has not been a commercial seabed mining operation established anywhere in the world. Mining the deep sea is technologically and financially difficult. Equipment must operate at depths of thousands to tens of thousands of feet, where water pressure is immense.

54. The limited amount of seabed mining exploration and testing activities that have occurred have demonstrated that commercial mining—and even

the initial exploration activities—can have devastating effects on the marine environment.

55. Mining scours the seabed to extract nodules, stirring up toxic sediment and killing essentially all life in its path. Studies of mining disturbance have estimated that ecosystem recovery will take over 100 years. After minerals are transported to a vessel on the surface and separated out, the waste sediment is discharged near the surface or somewhat deeper. Sediment plumes from mining vehicles or from processing could extend for 60 miles or more, smothering habitats even far from the mining site. The sediment waste contains toxic metals such as copper, cadmium, zinc, and lead, as well as rare earth elements, that can enter the food chain and bioaccumulate in fish, whales, and other wildlife.

56. Exploration for seabed minerals uses a variety of technologies to map and sample the seafloor. Exploration relies heavily on active acoustic mapping (multibeam echosounders and side-scan sonar), as well as Remotely Operated Vehicles (ROVs) and Autonomous Underwater Vehicles (AUVs). These technologies introduce a significant amount of noise into the marine environment. Higher levels of noise are expected from surface support vessels' engines even when holding position, as they must run dynamic positioning systems continuously to keep ships stationed over sampling sites. This creates a constant, penetrating "cylinder of sound" in the water column. Anthropogenic noise in the ocean masks

communication among marine life, increases chronic stress, and disrupts feeding behaviors, particularly for marine mammals.

57. While smaller in scale than commercial mining, sampling involves the physical removal of nodules with box cores that can crush and kill organisms on the seafloor and stir up sediment plumes.

58. Light from exploration vessels also adversely affects marine wildlife. To conduct visual surveys, ROVs, AUVs, and benthic landers flood the bathypelagic and abyssal zones with intense, artificial halogen or LED light, which can cause irreversible blindness in marine organisms and disrupt food web dynamics. Surface lights on boats can also be harmful to wildlife, for example by disorienting seabirds.

59. Exploration vessels can also cause injury or death to animals from ship strikes and can spill pollution and marine debris. Vessel impacts can occur not only where exploration is taking place, but also while vessels are traveling to or from the project location.

60. All told, seabed mineral exploration can have multiple adverse effects on the ocean environment. If activities proceed to mining, the impacts increase exponentially.

## II. TMC USA APPLIES FOR AN EXPLORATION LICENSE.

61. On or before March 27, 2025, TMC USA officially requested a pre-application consultation with NOAA on forthcoming DSHMRA license applications.

62. In April 2025, TMC USA submitted a pair of applications to NOAA for exploration licenses in the CCZ. One application was for an area in the eastern part of the CCZ that TMC USA designated as area USA-A. The other—the subject of this case—was for a collection of areas spanning much of the CCZ that TMC USA designated as area USA-B.

63. On or about July 28, 2025, TMC USA submitted a revised Application for Polymetallic Nodule License for USA-B.

64. In it, TMC USA applies for an exploration license for an area covering 121,830.2 $km^2$ across six separate blocks. *See* Figure 1.

65. The application purports to demonstrate that TMC USA is eligible for an exploration license under the DSHMRA requirements.

66. The statement of financial capability in the application describes the financial resources of TMC USA's parent company, The Metals Company. It avers that The Metals Company will provide funding to TMC USA to "meet its obligations under [the] exploration license." This section cites several types of information that it claims demonstrate The Metals Company's ability to fund the

operations. Almost none of the material allegedly providing that information is included in or with the application made available to the public.




**Figure 1. Map Showing the Application Area's Location**

67. The statement of technological experience and capability in the application avers that TMC USA's capability "comes from the experience, learnings, and access to the data that [The Metals Company's] subsidiaries … have developed while conducting polymetallic nodule exploration programs over the last 13 years." The application references evidence of the subsidiaries' and potential contractors' experience, as well as reports from the subsidiaries and prior exploration activities, to support TMC USA's eligibility on this factor. Almost

none of that material is included in or with the application made available to the public.

68. The application includes an exploration plan that "TMC USA proposes to complete the necessary resource definition and environmental baseline data collection in TMC USA B to prepare a commercia [*sic*] recovery permit application for TMC USA B." It proposes to: "map the entire application area … using hull-based multibeam surveying"; complete certain habitat mapping and environmental baseline studies; conduct box core sampling; and conduct additional geophysical surveys using multibeam echosounders, side scan sonar, and sub-bottom profilers, as well as ROV-supported cone penetrometer geotechnical seafloor testing.

69. TMC USA concedes its proposed activities will have effects on the environment but claims they will have "no significant impact." In support of that assertion, the application cites the "environmental management performance," "baseline studies and test mining," "environmental studies," and "technical reports and datasets" from The Metals Company's subsidiaries. The application includes a "Summary of Historic Baseline Data" from the subsidiaries' contract areas, which also cites and describes hundreds of datasets and scientific studies. Almost none of the referenced material is included in or with the application made available to the

public. The application instead states that many materials are available "on request."

70. The application states, "TMC USA does not anticipate any use conflicts or interference with other users' freedom of the high seas due to its proposed exploration activities." The application cites and describes numerous reports, data, and other materials to support its assertion. None of the referenced materials is included in or with the application made available to the public.

71. TMC USA requested confidential treatment for a portion of its application material pursuant to 15 C.F.R. § 971.802. Accordingly, much of the publicly available application is redacted.

## III. NOAA PUBLISHES NOTICE OF TMC USA'S APPLICATION FOR PUBLIC COMMENT.

72. On December 23, 2025, NOAA published notice of the TMC USA Applications A and B for public review and comment. 90 Fed. Reg. 60064 (Dec. 23, 2025).

73. The only material that NOAA made available for public review on the Regulations.gov docket (NOAA–NOS–2025–1330) and on NOAA's DSHMRA website[2] related to TMC USA's Application B was the Federal Register notice of availability and the application itself.

[2] https://oceanservice.noaa.gov/deep-seabed-mineral-resources/deep-seabed-mining/

74. On January 13, 2025, Plaintiffs sent a letter to NOAA via email and submission on the Regulations.gov docket requesting that the agency make available all relevant material for TMC USA's two applications, as required by DSHMRA. Plaintiffs specifically identified several categories of relevant material that must be made available, including, but not limited to:

a. datasets and scientific studies that were cited or described in TMC USA's applications in support of its statements and analyses (including several datasets that the application indicated are available "on request");

b. NOAA's documents related to the applications, including its determination that TMC USA's applications were complete, memoranda, and correspondence with TMC USA on its applications, such as requests for additional information;

c. Materials produced by NOAA or other agencies as part of DSHMRA's interagency review process; and

d. Any documents in NOAA's possession pertaining to TMC USA's financial and technical capabilities.

75. Plaintiffs explained that NOAA had stated in response to a Freedom of Information Act (FOIA) request from Plaintiff CCH that the application itself constitutes only "[p]art of" the "records related to the application [and] pre-

application consultation" that CCH had requested. That FOIA request had sought "all records related to the application, pre-application consultation, or any other communications or agency consideration regarding a potential [DSHMRA] license or permit" for TMC USA.[3]

76. NOAA did not respond to Plaintiffs' request to make all relevant materials available for public review, nor did it make any additional materials available for public review.

77. On February 23, 2026, Plaintiffs submitted comments on TMC USA Applications A and B via Regulations.gov that, among other things, reiterated that NOAA failed to provide interested persons with all materials relevant to the applications, in violation of DSHMRA.

78. Without all the relevant materials, Plaintiffs were unable to comment fully on the four requirements for certification under 30 C.F.R. § 1413(c).

IV. NOAA CERTIFIES TMC USA APPLICATION B.

79. On or about May 26, 2026, NOAA certified TMC USA Application B pursuant to 30 U.S.C. § 1413(c) and 15 C.F.R. § 970.400.

80. NOAA did not provide public notice of the certification until it published a Notice of Intent to prepare an environmental impact statement on the

---

[3] As of this date, the only materials NOAA has produced in response to CCH's FOIA request are TMC USA's applications.

proposed issuance of an exploration license to TMC USA for USA-B. 91 Fed. Reg. 53235 (Aug. 17, 2026).

81. As of this date, NOAA has not made its certification decision publicly available.

CLAIM FOR RELIEF

**FIRST CAUSE OF ACTION – NOAA's Certification Is Not in Observance of Procedure Required by Law and Is Arbitrary and Capricious and Contrary to Law, in Violation of DSHMRA and the APA.**

82. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

83. DSHMRA requires NOAA to publish a Federal Register notice of any application that NOAA has deemed in substantial compliance with DSHMRA. 30 U.S.C. § 1426(a)(1). The statute requires that "[i]nterested persons shall be permitted to examine the materials relevant to any of these actions, and shall have at least 60 days after publication of such notice to submit written comments to the Administrator." *Id.*; *see also* 15 C.F.R. § 970.212(a).

84. NOAA may only certify an application if, following that legally required procedure, it finds in writing that the applicant meets DSHRMA's eligibility requirements. 30 U.S.C. § 1413.

85. NOAA's determination to certify TMC USA's Application B is an agency action made reviewable by statute as defined by the APA, for which there is no other adequate remedy in a court. *See* 30 U.S.C. § 1416(d).

86. NOAA was required to make available to the public all "materials relevant to" TMC USA's Application B for at least 60 days during which it accepts public comment. Materials relevant to TMC USA's Application B include, but are not limited to: datasets, scientific studies, reports, and any other documents that were cited or described in TMC USA's application; NOAA's documents related to the application, including any determinations regarding TMC USA's application, memoranda, and correspondence with TMC USA; materials produced by NOAA or other agencies as part of DSHMRA's interagency review process; and any other documents in NOAA's possession pertaining to TMC USA's eligibility for certification.

87. Aside from TMC USA's Application B, NOAA did not make any materials relevant to the application available for public inspection as required by DSHMRA.

88. For the foregoing reasons, NOAA's certification of TMC USA's Application B was done without observance of the procedure required by law, in violation of the APA. 5 U.S.C. § 706(2)(D). For the same reasons, NOAA's certification of TMC USA's Application B is arbitrary, capricious, an abuse of

discretion, and not in accordance with DSHMRA or its implementing regulations, in violation of the APA. *Id.* § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Enter a declaratory judgment that NOAA's certification of TMC USA's application for an exploration license for USA-B violates DSHMRA, its implementing regulations, and the APA;

2. Hold unlawful and set aside NOAA's certification of TMC USA's application for an exploration license for USA-B;

3. Issue appropriate injunctive relief;

4. Maintain jurisdiction over this action until NOAA complies with DSHMRA, the APA, and every order of this Court;

5. Award Plaintiffs the costs of this litigation, including reasonable attorney fees; and

6. Provide such other relief as may be just and proper.

DATED: Honolulu, Hawai'i, September 30, 2026.

Respectfully submitted,

/s/ Harley M. Broyles

HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436

Email: hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

BRETTNY HARDY
(*pro hac vice* pending)
EARTHJUSTICE
180 Steuart Street #194330
San Francisco, California 94105
T: (415) 217-2000
Email: bhardy@earthjustice.org

Attorneys for Plaintiffs
Conservation Council for Hawaiʻi and
Center for Biological Diversity